500 P.2d 1319

Hermelo C. GURULE, Sr., Plaintiff-
Appellee,

v.

ALBUQUERQUE–BERNALILLO COUNTY
ECONOMIC OPPORTUNITY BOARD and
Firemen's Fund Insurance Co., Defendant-
Appellant.

No. 812.

Court of Appeals of New Mexico.

July 14, 1972.

Certiorari Denied Aug. 24, 1972.

Peter J. Adang, Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, for defendant-appellant.

Gerald Goodman, Albuquerque, for plaintiff-appellee.

## OPINION

HERNANDEZ, Judge.

In this workmen's compensation proceeding, the trial court entered an award for the plaintiff and the defendants appeal.

Defendants raise two points on appeal: (1) The district court committed reversible error in finding that the plaintiff was totally disabled under the New Mexico Workmen's Compensation Act; and, (2) The district court committed reversible error in the method of application of § 59–10–18.8 (D), N.M.S.A.1953 (Repl. Vol. 9, pt. 1) to the facts of this case.

Plaintiff was employed by defendant Albuquerque-Bernalillo County Economic Opportunity Board, herein referred to as E.O.B., as a janitorial custodian and watchman. On May 17, 1969, while moving a medical examination table, with the help of another person, plaintiff slipped on a step, injuring his low back.

Plaintiff at the time of the accident was 44 years old and he had worked at the E.O.B. center since June 15, 1967. He had left school at the end of the fifth grade and he had received no other schooling or training. He had worked for a feed store for ten years loading and unloading sacks of feed. He later worked as a truck driver and in 1959 he went to work for a storage company loading and unloading furniture. On November 9, 1961, while employed by the storage company, he injured his back and ultimately underwent surgery three times. The first resulted in laminectomy and fusion at the L5–S1 level of his spine, the second in laminectomy and fusion at the L4–L5 level and the third in laminectomy and fusion at the L3–L4 level. It was determined in cause no. 96873 in December of 1964, in the district court of Bernalillo County that the plaintiff was presently totally disabled and that compensation for total disability was to be paid until further order of the court. From November 9, 1961 until May 31, 1966 the plaintiff was paid $8,875.70 in weekly installments of $38.00 each. On May 31, 1966 a lump sum settlement was reached and he was paid the additional sum of $6,500.00, making the total received $15,375.70. On June 17, 1968, plaintiff was involved in an automobile accident which aggravated his back condition and caused him to miss some work. How-

ever, he continued to work for E.O.B. until the accident of May 17, 1969 and he has not worked since.

At the outset let us state that we will view this matter in the spirit expressed by Judge Murrah in Evans v. Stearns-Roger Manufacturing Co., 253 F.2d 383 (10th Cir. 1958) "To hold that the employer's liability should be diminished because his injured workman has seen fit to suffer the discomforts of his infirmity and obtain employment, rather than to simply exist on the compensation the law allows him, seems to us inconsistent with the purpose and intent of the workman's compensation act."

We will examine the evidence in the light most favorable to the plaintiff and, we will not disturb a finding, supported by substantial evidence, nor will we weigh conflicting evidence. Fitzgerald v. Fitzgerald, 70 N.M. 11, 369 P.2d 398 (1962); Adams v. Loffland Brothers Drilling Company, 82 N.M. 72, 475 P.2d 466 (Ct.App.1970).

An examination of the record reveals the following as to each of these findings of fact which were cited by defendants as not being supported by substantial evidence.

No. 24:

"That plaintiff suffered as a result of the accident and injury of May 17, 1969, a fracture and movement in the prior fusion of the L3–L4 level of his spine, and nerve root compression."

First, evidence relating to the condition of plaintiff's spine prior to the accident of May 17, 1969 from reports of the surgeon, who performed the three operations necessitated by plaintiff's injury of November 11, 1961: report of June 25, 1965, "There is no evidence of acute nerve root irritation at the present time . . . "X-rays of the back reveal what appears to be a solid fusion mass now extending from L3 to the sacrum;" report of December 15, 1965, "This patient is now over one year following his most recent surgery. X-rays in the past have indicated to me that this patient has a solid spine fusion now extending from L3 to the sacrum."

Plaintiff's condition after the accident of May 17, 1969 from the testimony of Dr. David D. Long, who performed the surgery necessitated by that accident:

"Q. Now what did your surgery [reveal]?

"A. It was as we had anticipated, a pseudoarthrosis at the L3 and L4 level. We decompressed the nerve root at that level on the left-hand side, the one we felt to be related to the radiation of pain down the leg symptomatology. It was fairly devoid of fat around it, which is a sign of irritation. And then went ahead and repeated the attempted fusion at the L3–L4 level.

"Q. Now, what is it—you used the word pseudoarthrosis. What do you mean by that?

"A. Pseudo is false and arthrosis is the Greek word for joint, so a pseudo-arthrosis is technically a false joint, but motion in an area where more motion should not be existent. And this can occur following a fracture where instead of having a solid healing across it, there is a minor degree of motion. Or, as in this case, following an attempted fusion, where minor degrees of motion still occur, rather than being solid.

"Q. Was it consistent with the complaint that he presented to you in the history, about feeling [like he was being hit by] the sledgehammer being hit in the back at the time he was lifting this heavy object?

"A. Yes."

He also testified:

"Q. Do you have an opinion, you know the medical probability, based on the history that you took, and examination and surgery and treatment, whether there was a direct causal connection between this injury that he complained of in May of '69, the sledgehammer in the back, and the impairment that you determined on

your examination and your surgery?

"A. I think I would have to say 'Yes'." On cross-examination he testified, in part, as follows:

"Q. Now, based upon all of the medical reports which I have asked [you] to review here, and what you now know about the prior history of Mr. Gurule, it is possible, is it not, Doctor, that on that date in May, 1969, Mr. Gurule did not suffer any separate or distinct trauma but that what he experienced was simply a recurrence of the condition that he had manifested for some years prior to that time?

"A. In medicine, anything is possible, so I have to say 'Yes'. However, the story that he tells makes me think that is not the situation."

Findings of fact No. 29 and No. 30 will be considered together and in light of the following definition.

Total disability is defined in § 59–10–12.18, N.M.S.A.1953 (Repl.Vol. 9, pt. 1, Supp.1971), as follows:

"As used in the Workmen's Compensation Act [59–10–1 to 59–10–37], 'total disability' means a condition whereby a workman, by reason of an injury arising out of, and in the course of, his employment, is wholly unable to perform the usual tasks in the work he was performing at the time of his injury, and is wholly unable to perform any work for which he is fitted by age, education, training, general physical and mental capacity, and previous work experience."

No. 29 reads as follows:

"That plaintiff as a direct and natural result of the accidental injury of May 17, 1969, coupled with the pre-existing painful, limiting condition from which the plaintiff suffered, was and is permanently and totally disabled in that he suffers an entire permanent loss of his wage earning ability, and was and is unable to return to any gainful employment, including plaintiff's inability to perform the same janitorial functions which he performed before May 17, 1969."

No. 30 reads as follows:

"That plaintiff is presently and for the foreseeable future unable to perform the usual tasks of the work he was performing prior to and on May 17, 1969 for the EOB, and he is also unable to perform any tasks which he may have been permitted to perform, taking into consideration his age, education, training, general physical and mental capacity, and previous work experience."

Plaintiff testified, in part, as follows:

"Q. Do you do anything around the house to help? Can you do any physical kind of work?

"A. No."

Dr. Peter J. Marquez, an osteopath who treated Mr. Gurule after the accident, testified as follows:

"Q. What was your prognosis as far as Mr. Gurule's future?

"A. I believe he is going to have increasing physical deterioration as concerns his low back. As far as employment is concerned, he is going to have to find something that does not require exertion, perhaps an assembly man job, if we had large factories in Albuquerque, TV repair if he could master the technique, something of absolutely sedentary nature, certainly nothing requiring exertion."

Dr. David D. Long testified on cross-examination, in part, as follows:

"Q. Now you said in your opinion Mr. Gurule is now disabled from doing heavy work and you have agreed that he was probably disabled from doing heavy work before May, 1969?

"A. Uh-huh.

"Q. That does not mean, you are saying are you, that he is disabled, in your

opinion, from doing all kinds of work?

"A. Correct.

"Q. And you would agree, would you not, that Mr. Gurule probably could do, within defined limits, sedentary and light types of labor at the present time?

"A. Probably, yes."

Also on cross-examination Dr. Long testified as follows:

"Q. In your experience, and in medical literature, do they go back to gainful employment after they have a spinal fusion?

"A. Yes, but the more spinal fusions and the more spinal operations you get, that number decreases significantly. So I think the implication of the question, you should not include Mr. Gurule in that category at all."

Findings of fact No. 19 and No. 27 will be considered together. No. 19 reads as follows:

"On or about June 17, 1968 plaintiff was involved in an automobile accident which required temporary treatment, but did not permanently impair plaintiff's ability to perform his tasks as janitorial custodian for the EOB."

No. 27 reads as follows:

"That for approximately two years prior to the accidental injury of May 17, 1969, plaintiff was able to satisfactorily perform the janitorial and watchman duties required to be performed by the EOB."

Mrs. Josie Chavez, assistant director of the E.O.B. Barelas Opportunity Center, on direct examination testified, in part, as follows:

"Q. Were you acquainted with him [Mr. Gurule] when he worked at the Barelas Opportunity Center?

"A. Yes. Most of the history I have been hearing I heard before by him.

"Q. In what capacity was he employed there?

"A. In the capacity of custodian. He got into employment by the policy of Board recommendations and through the E.O.B. he was hired as custodian.

"Q. You heard the testimony he started in June, 1967?

"A. Right.

"Q. Is that correct?

"A. That's correct.

"Q. When he worked, what were his hours of work?

"A. He worked at night time, seven to four o'clock in the morning, I think, or three o'clock in the morning."

On cross-examination she testified, in part, as follows:

"Q. Do you have a record of his absences in 1968 and 1969?

"A. Yes, sir.

"Q. Count out the number of days he missed in 1969.

"A. Twenty days sick leave.

.   .   .   .   .   .

"Q. How many were before May 17th and how many after May 17th?

"A. They were six days before May 20th that I have here.

"Q. And how many days did he miss in 1968 from work. Do you have a record of that?

"A. Twenty-three days.

"Q. How many did he miss in 1968?

"A. 1968 he had twenty-three days—no, that is fifteen days, I am sorry."

On direct examination the plaintiff, in this regard testified as follows:

"Q. And your job was custodian and watchman.

"A. Yes.

"Q. Your hours were eight P.M. to four A.M.?

"A. Yes.

"Q. Let me ask you in some detail what you were doing. The custodian part of your job, as I understand your testimony, you would have

to each night sweep, mop and wax floors at the center?

"A. Yes.

"Q. This was Monday through Friday?

"A. Saturday.

. . . . . .

"Q. You have indicated that in June, 1968, you did have an automobile accident; is that right?

"A. Yes.

"Q. Now, that accident aggravated your back condition, didn't it?

"A. Yes."

On cross-examination Mr. Gurule testified, in part, as follows:

"Q. Did you miss any work between June, 1968 and May, 1969?

"A. Yes, I did. I lost about twenty days.

"Q. All right, and this was because of the problem you were having resulting from the accident?

"A. Yes, sir."

Dr. Marquez testified, in part, as follows:

"Q. How long did you treat him after the automobile collision in June, 1968?

"A. Yes, sir, I was dismissed from that case on January 10th, 1969, which was the last time I saw him for that specific incident, so approximately five months.

. . . . . .

"Q. Doctor, pardon me, do you know whether or not or when he returned to work during that period? Do your records indicate that?

"A. Yes, he did return to work. . . ."

■ We hold that there was substantial evidence to support the trial court's findings of fact. The other findings of fact cited by defendants as not being supported by substantial evidence are not essential to the judgment of the trial court and will not be considered. As was stated in Paulos v. Janetakos, 43 N.M. 327, 93 P.2d 989 (1939),

"The mere making of unnecessary and superfluous findings or the presence of error in findings on immaterial, irrelevant, or purely collateral issues is harmless and non-reversible error if the judgment is otherwise sufficiently supported."

Defendants, in their attack upon the trial court's findings of fact, raise several attendant issues which we will consider.

■ Defendants point out that the testimony of plaintiff's own witness indicates that he suffered considerable pain in his back prior to the accident of May 17, 1969 and that his complaints were identical with his complaints after the accident. That Dr. Marquez, who had attended plaintiff after his automobile accident in June of 1968, had advised him not to return to work for the E.O.B. That the medical treatment plaintiff received after the accident was identical to that received before. In other words, that his physical condition was not significantly different after than before the accident and that therefore it was error to determine that he was totally disabled. Granted this is true; however, there is one significant difference. He was working prior to the accident and there was evidence that he would be unable to work afterward.

The situation presented here is comparable to that in Reynolds v. Ruidoso Racing Association, Inc., 69 N.M. 248, 365 P.2d 671 (1961), where our Supreme Court concluded that the trial court erred in limiting the claimant's recovery to 10% permanent disability and remanded the cause with instructions to enter a new judgment granting recovery for total disability. We quote: "From an examination of the evidence it seems clear that claimant, because of his bone condition, probably shouldn't have been working, and might be described as being totally disabled medically. However, the fact remains that he was employed and had been performing his duties. . . ." The court went on to conclude: "Accordingly, regardless of what his condition indicated to the doctors he was not so disabled as to be unable to work, and was

not actually totally disabled." This, coupled with the following from Snead v. Adams Construction Co., 72 N.M. 94, 380 P.2d 836 (1963), dispose of this issue, "There is no presumption in our law that every workman is completely able-bodied when he enters his employment; the measure of disability under our statute is the relationship between the workman's ability to do work prior to the injury, and such ability following the injury." We also point out that in the present case there is no certificate of pre-existing disability, see § 59–10–37, N.M.S.A.1953 (Repl.Vol. 9, pt. 1), and no certificate of pre-existing impairment, see § 59–10–13.3, N.M.S.A.1953 (Repl. Vol. 9, pt. 1, Supp.1971).

■ Defendants also raise the issue that there was no evidence introduced to support that part of finding of fact No. 27 which states "plaintiff was able to *satisfactorily* perform the janitorial and watchman duties . . ." [Emphasis ours]. It is correct that there was no evidence introduced that he was *satisfactorily* performing his duties but there was evidence that he was performing his duties. As will be noted from the definition of "total disability" supra, all that is required is that a workman "is wholly unable to perform the usual tasks *in the work he was performing* at the time of his injury." [Emphasis ours].

Another of the attendant issues raised by defendants is that some of the medical evidence presented by plaintiff was inconsistent with and contradictory of other parts of his evidence and that therefore it should not·be considered substantial enough to support the pertinent findings of fact.

■■ A party is bound by his own evidence, Harless v. Ewing, 81 N.M. 541, 469 P.2d 520 (Ct.App.1970). However, if his evidence is inconsistent or contradictory it is for the trial court to reconcile the contradiction or inconsistency and say where the truth lies. Durrett v. Petritsis, 82 N.M. 1, 474 P.2d 487 (1970); Alvillar v. Hatfield, 82 N.M. 565, 484 P.2d 1275 (Ct.App. 1971). It is only where a party's entire

evidence is uncontradicted and adverse or unsubstantial that it fails. Romero v. Turnell, 68 N.M. 362, 362 P.2d 515 (1961).

Defendants in their second point for reversal allege that the trial court erred in the method of application of § 59–10–18.8 (D), N.M.S.A.1953 (Repl.Vol. 9, pt. 1, Supp.1971) to the facts of the case, which section provides as follows:

"[T]he compensation benefits payable by reason of disability caused by accidental injury shall be reduced by the compensation benefits paid or payable on account of any prior injury suffered by the workman if compensation benefits in both instances are for injury to the same member or function, or different parts of the same member or function, or for disfigurement, and if the compensation benefits payable on account of the subsequent injury would, in whole or in part, duplicate the benefits paid or payable on account of such prior injury."

The trial court in its conclusion of law No. 12 determined:

"That compensation benefits payable to the plaintiff as a result of the accidental injury of May 17, 1969, do not substantially *duplicate* compensation benefits paid plaintiff on account of the accidental injury of November 1, [November 9,] 1961 except for an overlap of 13 weeks, during which plaintiff received compensation benefits pro rata as a result of the first injury, at a rate of $38.00 per week." [Emphasis ours]

How the trial court arrived at this conclusion is set out in the court's finding of fact No. 32:

"Compensation paid to plaintiff from November 9, 1961, to August 14, 1969, ($15,375.70 divided by $38.00 per week, equals 405 weeks) as a result of Cause No. 96873 overlaps the 500 weeks at $45.-00 per week compensation entitlement resulting from the instant compensable injury starting May 17, 1969, by a total of 13 weeks."

Defendants state that it was error for the trial court to conclude that this section

applies only during the 500 week period of disability benefits allowable for the injury of November 9, 1961 and that it applies only to benefits remaining payable for the injury of November 9, 1961. It is defendants' position that all of the monies paid to plaintiff for the injury of November 9, 1961 duplicate the benefits payable under the trial court's award for the injury of May 17, 1969 and that this award should be reduced by the amount of the prior award since both injuries were to the same member or function.

It can be inferred from the trial court's finding of fact and conclusion of law just quoted that the injuries of November 9, 1961 and May 17, 1969 were to the same member or function. The word "member" being defined, anatomically speaking, in Webster's New International Dictionary of the English Language, 2nd Edition, as "a part or organ of the animal body; esp., a limb or other separable part." "Function" being defined, physiologically speaking, as "the normal and special action of any organ or part of a living animal or plant." The trial court was correct, both injuries were to the same member or part of the body i. e. the spine at the L3–L4 level.

Although the subsequent injury in this case was to the same member or function, this does not automatically require a reduction of benefits payable for the subsequent injury. Section 59–10–18.8(D), supra, also states:

"   .   .   .   and if the compensation benefits payable on account of the subsequent injury would, in whole or in part, *duplicate* the benefits paid or payable on account of such prior injury." [Emphasis ours]

The trial court found and we agree that the compensation benefits payable to the plaintiff for the injury of May 17, 1969, did not entirely duplicate the benefits paid him for the injury of November 1, 1961. The plaintiff had recovered from his prior injury to such an extent that he was able to work again granted not without some pain and discomfort. According to the trial court, benefits payable for the May 17, 1969 injury overlap compensation paid for the November 1, 1961 injury by thirteen weeks. Apart from this overlap, which will be discussed hereinafter, benefits payable for the subsequent injury do not duplicate benefits paid for the prior injury.

Implicit in the arguments of defendants on this point is the contention that since the plaintiff had previously been declared totally disabled he can never again receive an award under our workmen's compensation law. Assuming the earlier finding of present total disability prior to the lump sum settlement for the 1961 injury continued, because not changed by court order, we disagree with this contention. Larson, in "The Law of Workmen's Compensation," Vol. 2, No. 59.42, pages 88.170 and 88.171, states: "The capacities of a human being cannot be arbitrarily and finally divided and written off by percentages. The fact that a man has once received compensation as far as 50 percent of total disability does not mean that ever after he is in the eyes of compensation law but half a man, so that he can never again receive a compensation award going beyond the other 50 percent of total." See Ryder v. Sandlin, 70 N.M. 377, 374 P.2d 133 (1962). Section 59–10–18.8(D), supra, does not state that a workman may not receive compensation benefits for successive injuries. It does state that when there are successive injuries to the same member or function, benefits for the subsequent injury may not duplicate benefits paid or payable for the prior injury. It is the overlap in benefits to which the reduction applies. Compare Reed v. Fish Engineering Corporation, 76 N.M. 760, 418 P.2d 537 (1966).

The trial court found that the overlap in compensation benefits for the two injuries was 13 weeks and reduced the award for the 1969 injury accordingly. It found the 13 week overlap by determining the total compensation received for the 1961 injury, and dividing the maximum compensation rate (then $38.00 per week) into

this amount to reach a quotient of 405 weeks. Thirteen weeks of this 405 weeks overlapped with the 1969 injury.

Defendants assert this calculation was wrong. They contend the weekly compensation paid, plus the lump sum settlement for the 1961 injury amount to a total disability. On this basis, defendants contend the trial court should have used a 500 week figure instead of a 405 week figure in calculating the overlap.

We disagree. Defendants' contention is based on the assumption that the lump sum settlement was for a total disability. This assumption is not supported by the record. At various times, the District Court found that in connection with the 1961 injury, Gurule was *then* totally disabled. The last such finding was in February, 1965. The lump sum settlement occurred in May, 1966. This settlement, and the judgment approving the settlement, do not mention the extent of Gurule's disability at that time. On this evidence the trial court found that no order or judgment established that Gurule was totally disabled. This finding is not challenged.

In the light of the evidence and the trial court's finding, the claim of defendants, that the 1961 injury was disposed of on the basis of total disability is not supported by the record. Defendants would have us reach this conclusion as a matter of law on the basis that the amount of the lump sum settlement was the discounted result of the amount left to be paid for a total disability. Our answer is that the record does not support this contention and our review is limited to the record.

On the basis of the record, we cannot say the trial court erred in basing its overlap on 405 weeks compensation for the 1961 injury rather than 500 weeks. In so holding, we do not attempt to outline the permissible methods which may be used in arriving at a duplication of benefits under § 59–10–18.8(D), supra.

Defendants, in arguing their view of § 59–10–18.8(D), supra, assert that the meaning of this section should be reached by considering the limitations set forth in § 59–10–18.8(A) and (B), supra. Thus, they contend Paragraphs A and B demonstrate that the limitation on the number of weeks and amount of compensation in these paragraphs shows a legislative intent in Paragraph D to deduct 100% of a prior award for an injury to the same member or function. We do not find that such a contention was raised in the trial court; therefore, it is not before us for review. However, on this issue see Larson, supra.

We affirm. Because of the number of issues raised the plaintiff is awarded the sum of $1,750.00 for attorneys' fees in this appeal.

It is so ordered.

WOOD, C. J., concurs.

COWAN, Judge (dissenting).

COWAN, Juge (dissenting).

The New Mexico Workmen's Compensation Act contains provisions setting out circumstances under which compensation will or will not be paid. It also contains provisions placing limitations on compensation benefits as to time, amount and previous payments. These various provisions of the Act should be afforded equal weight. The majority, however, fails to weigh Section 59–10–18.8, N.M.S.A.1953 (Repl.Vol. 9, pt. 1, 1971 Supp.) accurately and, as a result, misapplies this provision to the facts of the case.

In addition to limiting compensation benefits to 500 weeks and to $28,500.00, the weekly benefits are further limited by subparagraph "D" of Section 59–10–18.8, supra. This subparagraph states:

"D. the compensation benefits payable by reason of disability caused by accidental injury shall be reduced by the compensation benefits paid or payable on account of any prior injury suffered by the workman if compensation benefits in both instances are for injury to the same member or function, or different parts of the same member or function, or for disfigurement, and if the compensation

benefits payable on account of the subsequent injury would, in whole or in part, duplicate the benefits paid or payable on account of such prior injury."

The question presented here has not been answered in New Mexico and the cases cited in the majority opinion are not persuasive. The question is not whether the plaintiff was able to work prior to the second accident. The question is whether he is entitled to *receive compensation* for a disability for which he has already been compensated, in the face of the prohibitory statute.

The majority quotes from *Larson* as authority for its position but I do not deem the quote applicable nor persuasive. It is a generality only, and no consideration is given or reference made to a statutory provision similar to subparagraph "D" supra.

Plaintiff injured his low back in 1961 and was judicially determined to be totally disabled because of that injury. That determination was never set aside or amended and he was paid in full for the disability. Plaintiff then returned to work and received a second injury to his low back. The trial court found that *both injuries were to the same function* and that the plaintiff was totally disabled. Benefits are not determined by the occurrence of an injury but by the disability produced thereby. Lozano v. Archer, 71 N.M. 175, 376 P.2d 963 (1962). The plaintiff has already been compensated for his disability to the extent of the money paid him because of the 1961 injury. To pay him again for the same disability would certainly duplicate, in whole or in part, the benefits paid him because of the 1961 injury. Any other interpretation of the ordinary language of subparagraph "D" represents a legal distortion of legislative intent.

It is not within the province of this court to legislate socio-economic reforms. That is a matter for the lawmakers. Here, the legislature has spoken clearly and unambiguously and it is the duty of this court to give that clear and unambiguous language full weight and deliberate consideration.

If the statute may cause harsh results in some cases, the situation should have the attention of the legislature. We have no right by construction to strip the statute of its clear legislative purpose. Our Supreme Court, in Montoya v. Sanchez, 79 N.M. 564, 446 P.2d 212 (1968), has stated the position unequivocally:

"  .  .  . Admittedly, the economic impact on the plaintiff is to be regretted; but we cannot, even under our longstanding liberal construction of the Workmen's Compensation Act, judicially amend  .  .  ."

Compensation benefits payable to the plaintiff as a result of the second injury should be reduced by the compensation benefits paid him on account of the 1961 injury. The majority holding to the contrary, I dissent.